IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TIMOTHY M. DECKER, #368787<br>    Plaintiff<br>v.<br><br>WEXFORD HEALTH MEDICAL<br>  DEPARTMENT<br>AVA JOUBERT, MD<br>    Defendants | *<br><br>*   CIVIL ACTION NO. PWG-13-3754<br>*<br><br>*<br><br>***** |

## MEMORANDUM

Pending is defendants' motion to dismiss or, in the alternative, for summary judgment, which remains unopposed. ECF No. 11. Upon review of the pleadings filed, I find a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014).

### Background

Plaintiff, an inmate confined at Western Correctional Institution ("WCI"), alleges in his court-ordered supplemental complaint that he has had "multiple problems" getting adequate medical treatment for "unbearable" pain. He claims that he has been advised by defendants that any recommendations for a new prosthetic device or back surgery would not be carried out because of the costs and the short time left on his sentence. He complains that that defendants' actions constitute deliberate indifference as their treatment evinces a wish to "cut costs [and to] generate profits" over the need to provide him medical care. Plaintiff asserts that he receives pain medication, but the prescription does not alleviate his discomfort. ECF No. 3, at 3–6. He seeks injunctive relief so as to receive a new prosthetic leg, a referral to a neurosurgeon, back surgery and an undetermined amount of compensatory and punitive damages. *Id.* at 3, 6.

Defendants provided in excess of 280 pages of medical records and defendant Joubert's affidavit in support of their motion for summary judgment. ECF No. 11. They assert that Plaintiff is a 32-year-old male with a medical history significant for an above-the-knee amputation to his left leg, thoracic aortic stent placement, and chronic pain secondary to a trauma related to a 2006 motor vehicle accident. *Id.* at Exs. 1 & 2. He also has a medical history of a gunshot wound to the right hand resulting in a surgical repair in 2010, hypertension, chronic migraines, and back pain. Additionally, Plaintiff has a mental history significant for bipolar disorder, depression, and anxiety. *Id.*

Significant to the issues pending before the Court are records indicating that in 2011, plaintiff reported severe back pain related to five herniated discs. Diagnostic x-rays taken of the thoracic and lumbar spine in January of 2011, showed preserved disc space, a normal vertebrae body, and lordosis of the thoracic and lumbar spines.[1] *Id.*, Ex. 1, at 272. Bilateral screws and plates in the lumbar spine were identified consistent with orthopedic trauma. *Id.*, Ex. 2. Upon examination by a nurse on March 12, 2011, plaintiff's spine tested positive for muscle spasm and tenderness of the lumbar spine. He voiced subjective complaints of moderate pain at the lumbosacral spine radiating to his right leg which increased when walking. *Id.*, Ex. 1, at 7–8. Plaintiff was prescribed Neurontin, Robaxin, and Naprosyn for his complaints.[2]

---

[1] Lordosis refers to the inward curve of the lumbar spine (just above the buttocks). A small degree of lordosis is normal. Too much lordotic curving is called swayback. *See* http://www.nlm.nih.gov/medlineplus/ency/article/003278.htm.

[2] Neurontin (gabapentin) is an anti-epileptic medication, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. *See* http://www.drugs.com/neurontin.html. Robaxin (methocarbamol) is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to the brain. *See* http://www.drugs.com/robaxin.html. Naproxen or Naprosyn is a nonsteroidal anti-inflammatory drug ("NSAID"). It works by reducing hormones that cause inflammation and pain in the body. *See* http://www.drugs.com/naproxen.html.

In May of 2011, plaintiff was transferred from the Baltimore prison region to WCI. He was seen by Dr. Joubert on June 6, 2011, and reported an amputation following a 2006 accident where he was hit by a drunk driver. He also reported five herniated discs and claimed that he used crutches for ambulation, but the right-hand gunshot injury was making it difficult for him to use them. ECF No. 11, Ex. 1, at 14–16, 223. Dr. Joubert requested an occupational therapy consult to determine the most appropriate device to assist with plaintiff's ambulation. Plaintiff was continued on his pain regimen of Neurontin, Robaxin, and Naproxen.

On June 9, 2011, plaintiff was seen by an occupational therapist. *Id.*, Ex. 1, at 17, 271. At that time plaintiff reported his gunshot wound made it challenging to use his crutches and he had increased back pain on ambulation over long distances. The therapist recommended issuing plaintiff a wheelchair for independent mobility over long distances and to decrease stress on plaintiff's hand and lessen his back pain. *Id.* In addition, physical therapy sessions were recommended to address plaintiff's back pain. *Id.*, Ex. 1, at 18–19. The sessions commenced on June 22, 2011 and plaintiff later reported improvement to his lumbar strain and back pain. *Id.*, Ex. 1, at 256–259. Additional therapy was ordered and, by July 25, 2011, plaintiff reported the resolution of pain. *Id.*, Ex. 1, at 261–266. On July 18, 2011, however, plaintiff was evaluated by Physician's Assistant ("PA") Schindler and reported that he was relying on his wheelchair "most of the time" for ambulation because he was unable to walk with crutches due to back pain. *Id.*, Ex. 1, at 26.

The record shows that during 2011 through 2013, plaintiff's sick-call complaints of back pain were responded to by healthcare personnel. He was prescribed Ultram[3] for pain and ordered

---

[3] Ultram (tramadol) is a narcotic-like pain reliever used to treat moderate to severe pain. *See* http://www.drugs.com/ultram.html.

to undergo repeat x-rays of the thoracic and cervical spine. ECF No. 11, Ex. 1, at 35–39, 43–45. The x-rays were unremarkable and showed no change from the previous completed study. *Id.*, Ex. 1, at 274. However, plaintiff was referred for a physiatrist consult[4] for his complaints of continued back pain.

In September of 2011, Wexford Health received a request for an orthotic evaluation for a possible prosthesis. It was noted that plaintiff had a prosthetic leg at home and recommended that a security clearance be obtained to bring the prosthetic leg into the prison for use during plaintiff's confinement. ECF No. 11, Ex. 2 ¶ 9. The security clearance was granted in January of 2012. *Id.*, Ex. 1, at 48.

On January 26, 2012, plaintiff was seen by physiatrist Cornell Shelton at Bon Secours Hospital and reported chronic back pain. *Id.*, Ex. 1, at 227–29. On examination, plaintiff's muscle strength was normal on the left and right lower extremity. Straight-leg and Hoffman tests[5] were negative. Shelton's impression was that plaintiff had lumbar radiculitis[6] on the lower right side, low back pain and right lower extremity parenthesis due to amputation. Dr. Shelton

---

[4] Physiatrists, or rehabilitation physicians, are nerve, muscle, and bone experts who treat injuries or illnesses that affect how one moves. Rehabilitation physicians are medical doctors who have completed training in the medical specialty of physical medicine and rehabilitation (PM&R). *See* http://www.aapmr.org/patients/aboutpmr/pages/physiatrist.aspx.

[5] The *Hoffmann sign* is used by examiners assessing patients with symptoms of *myelopathy* (spinal cord compression). The test is done by quickly snapping or flicking the patient's middle fingernail. The test is positive for spinal cord compression when the tip of the index finger, ring finger, and/or thumb suddenly flex in response. *See* http://www.eorthopod.com/hoffmann-sign-red-flag-for-cervical-myelopathy/news/142522.

[6] Lumbar radiculitis is an inflammation or irritation of a nerve root in the lower, or lumbar, region of the spine. When radiculitis is present, there is always some degree of pain present. This pain is a result of pressure on the nerve root (radicle) where it connects to the spinal column. The most common form of lumbar radiculitis is sciatica. *See* http://www.spinaldisorders.com/lumbar-radiculitis.htm.

recommended tapering down plaintiff's Neurontin, starting plaintiff on Lyrica,[7] increasing plaintiff's Baclofen, discontinuing the Naproxen and starting plaintiff on Mobic.[8] Shelton also recommended a lumbar epidural for pain management based on plaintiff's report that his prior physical therapy sessions had not been helpful. ECF No. 11, Ex. 1, at 227–28. The request for a lumbar epidural injection was approved and was scheduled. Plaintiff received the pre-operative lab work and examination. On March 8, 2012, he refused his scheduled medical trip to Dr. Shelton for the epidural injection because of the length of the ride and the need to stay at another prison. *Id.* at 60–62, 283.

On April 18, 2012, plaintiff was seen and evaluated by PA Flury. He advised Flury that his old prosthetic leg was loose-fitting around his thigh and was causing irritation. Flury noted that plaintiff was using a wheelchair to get around and wrote a consult request for an evaluation with Hanger Orthotics for an assessment. *Id.*, Ex. 1, at 64–65. On April 26, 2012, PA Sparks examined plaintiff and issued orders to implement the medication recommendations made by Dr. Shelton to include Lyrica in plaintiff's regimen. *Id.*, Ex. 1, at 66–69.

On May 20, 2012, plaintiff was transferred to the Jessup Pre-Release Unit and upon arrival was placed in the Chronic Care Clinic ("CCC") for pain management. *Id.*, Ex. 1, at 74–76, 78–81. Dr. Onabajo maintained plaintiff on his existing pain regimen and considered sending plaintiff to an outside pain management clinic. *Id.* In August of 2012, plaintiff was seen at Hanger Orthotics for a "readjustment" to his prosthesis. *Id.*, Ex. 1, at 234, 236; Ex. 2. On

---

[7] Lyrica is used to control seizures and to treat fibromyalgia. It is also used to treat pain caused by nerve damage in people with diabetes (diabetic neuropathy), herpes zoster (post-herpetic neuralgia, or neuropathic pain associated with spinal cord injury. *See* http://www.drugs.com/lyrica.html.

[8] Like Naproxen, Mobic (meloxicam) is an NSAID. Meloxicam works by reducing hormones that cause inflammation and pain in the body. *See* http://www.drugs.com/mobic.html.

August 21, 2012, he was reevaluated by Dr. Onabajo, who referred plaintiff back to Dr. Shelton for a possible epidural. In the interim, plaintiff's medication regimen was modified to include Lyrica. ECF No. 11, Ex. 1, at 83–86.

On September 13, 2012, plaintiff was seen and evaluated by Dr. Shelton at Bon Secours Hospital. *Id.*, Ex. 1, at 241–42. Plaintiff reported sharp pain and aches down his lower back radiating to his right leg. Shelton recommended increasing plaintiff's Lyrica and Baclofen dosages. He again recommended an epidural injection. *Id.*, Ex. 1, at 241, 283. In October of 2012, Dr. Onabajo increased plaintiff's Baclofen and Lyrica dosages. *Id.*, Ex. 1, at 87–89. Over the next several months, referral back to Dr. Shelton for pain management was denied and plaintiff was "advised to continue conservative pain management." *Id.*, Ex. 1, at 101–03, 115.

Plaintiff was seen by the on-site physician for monitoring of his back pain through July of 2013, and no changes were noted to his physical condition. *Id.*, Ex. 1, at 102–22. Dr. Onabajo, however, did submit a consult request on plaintiff's behalf for his return to Hanger Orthotics for an evaluation of his prosthesis because plaintiff claimed he could no longer use it due to weight loss. *Id.*, Ex. 1, at 116. On August 7, 2013, plaintiff was seen by Dr. Moultrie in the Jessup Correctional Institution CCC. The Lyrica prescription was renewed and the dosage was increased. *Id.*, Ex. 1, at 124–28.

On September 24, 2013, plaintiff was transferred back to WCI. *Id.*, Ex. 1, at 131. On October 11, 2013, he was evaluated by Dr. Joubert. He requested a new prosthesis at that time and inquired into his appointment with Dr. Shelton. *Id.*, Ex. 1, at 137–38. Throughout the next three months, plaintiff was seen by medical staff for his complaints of back discomfort. He was advised to continue his pain management regimen and range of motion exercises. *Id.*, Ex. 1, at 140–43. On December 31, 2013, plaintiff was seen in the CCC by Dr. Barrera and reported

continued break-through pain. Barrera noted that plaintiff's pain ran along the muscular part of the back at the right paralumbar thoracic area and concluded that the pain did not appear to be a spinal problem. He advised against narcotics or injections for pain and recommended Ibuprofen to take in conjunction with plaintiff's Lyrica and Baclofen prescriptions. ECF No. 11, Ex. 1, at 150–52.

On January 9, 2014, plaintiff was seen again by Dr. Barrera, who noted that plaintiff was requesting magnetic resonance imaging ("MRI") of his back. No significant findings were noted on examination and plaintiff was continued on his medication regimen. *Id.*, Ex. 1, at 155–56. Seven days later on January 16, 2014, plaintiff was referred to the Regional Medical Director, Dr. Colin Ottey, for evaluation and recommendation regarding the need for an MRI. Plaintiff reported his subjective claims of chronic pain. On examination, no motor weaknesses or sensory loss was observed and deep tendon reflexes were preserved and symmetric. Plaintiff's spine was positive for posterior tenderness and paravertebral muscle spasm. Ottey recommended deferring an MRI and attempting to improve plaintiff's pain management. He issued a prescription for Ultram. *Id.*, Ex. 1, at 158–61.

On January 30, 2014, plaintiff was seen by nursing staff in response to his complaint of back pain. He reported that his pain medication wore off at 4:00 p.m. and that his back pain was waking him up every 2 to 3 hours. *Id.*, Ex. 1, at 166–67. Plaintiff was referred to a provider. On February 4, 2014, plaintiff was evaluated by Nurse Mahler. He reported short-term relief in the past from steroidal injections and help from physical therapy. Mahler noted that old radiology studies of the spine revealed normal vertebral body heights and disc space and no acute disease. She found no paravertebral spasm or tenderness along the spine and concluded that there was no acute disease of the spine, but pain of a chronic nature. *Id.*, Ex. 1 at, 169–71. Mahler

recommended that plaintiff continue his current medication regimen, apply warm compresses, and complete back stretching. Plaintiff was advised that a request for physical therapy would be submitted on his behalf. His Ultram medication was renewed and a six-session course of physical therapy was approved. ECF No. 11, Ex. 1, at 169–71, 180.

An x-ray of plaintiff's right knee, taken in January of 2014, showed no acute disease. *Id.*, Ex. 1, at 276. On February 25, 2014, plaintiff was seen by the physical therapist. After an evaluation, the therapist created a plan of hot pack therapy, with passive extension exercises as tolerated, with the goal of decreasing lumbar back pain and establishing a self-management program.[9] *Id.*, Ex. 1 at pg. 267. On March 20 and March 22, 2014, plaintiff was seen by a physical therapist who applied heat therapy with passive extensions and stretching as tolerated. *Id.*, Ex. 1, at 269–70.

## Analysis

### Eighth Amendment Claim

Summary judgment properly is granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

---

[9] In March 2014, a consult request was completed by Nurse Mahler to have plaintiff re-evaluated at Hanger Orthotics. ECF No. 11, Ex. 2 ¶ 28. The request was denied on March 18, 2014 two days later based upon plaintiff's use of a wheelchair. *Id.*

In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The trial court has an "affirmative obligation" to "prevent 'factually unsupported claims [or] defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24)).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See*

*Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer,* 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F. 3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center,* 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer,* 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris,* 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton,* 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The evidence presented establishes that medical providers are not recklessly refusing to assess and treat plaintiff's conditions. Plaintiff's disagreement with the diagnosis or the manner in which the diagnosis was made is not a basis for an Eighth Amendment claim. Defendants are entitled to summary judgment in their favor. Plaintiff has been repeatedly examined and treated by nurses, PAs, therapists, doctors and pain specialists from 2011 to 2014. Further, radiology tests have revealed no abnormalities with plaintiff's thoracic and cervical spine. He has been

provided a wheelchair and crutches, afforded physical therapy, and continued on a pain management plan, receiving Lyrica, Baclofen, Robaxin, Naproxen, and Ultram. The record evidence indicates that Plaintiff's requests are considered, his needs are addressed, and he is encouraged by medical staff to keep them informed of any further episodes or serious symptoms.

The fact that plaintiff's requests for an MRI, a new prosthesis, and back surgery were not approved simply does not reflect deliberate indifference on the part of defendants. Even were I to credit plaintiff's unsupported allegations that budget concerns played a role in the decision to deny him certain treatment options, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir.1977) (emphasis added). Plaintiff's grievances with the conservative course of his medical treatment regarding what tests and treatments were necessary in light of the symptoms presented are reflective of his frustration, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). There are no exceptional circumstances alleged in this case.

Based upon the undisputed, objective evidence in the record, defendants are entitled to judgment in their favor. A separate order follows.

Date: 02-13-2015

Paul W. Grimm
United States District Judge